SEALY MATTRESS COMPANY OF NEW JERSEY, INC., Lillian Lewis and United Jersey Bank, co-executors of the estate of Morris Lewis, Walter Hertz, Lorraine Klein, Howard Lewis, Harold Naiman, and Harold and Rose Naiman, on behalf of themselves and derivatively on behalf of Sealy, Incorporated, Plaintiffs,

v.

SEALY, INC., The Ohio Mattress Company, Ohio–Sealy Mattress Manufacturing Co., Sealy Merging Corporation, Ernest M. Wuliger, Thomas Smudz, C. Steven Kneeland and Gary Pleasant, Defendants.

Civ. A. No. 8853.

Court of Chancery of Delaware, New Castle County.

Date Submitted: July 7, 1987.
Date Decided: July 20, 1987.
Revised: July 24, 1987.

Rodman Ward, Jr., Marc B. Tucker, Paul L. Regan and John G. Day of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for plaintiffs.

Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, for defendant Sealy, Inc.

Clark W. Furlow and Craig B. Smith of Lassen, Smith, Katzenstein & Furlow, Wilmington, and Frederic F. Brace, Jr. and Michael D. Craig, Chicago, Ill., for other defendants.

## OPINION

JACOBS, Vice-Chancellor.

This individual and derivative action was filed by minority stockholders of Sealy, Incorporated ("Sealy"), a Delaware corporation, on February 13, 1987, to enjoin a proposed cash-out merger of Sealy into a wholly-owned subsidiary of Ohio–Sealy Mattress Manufacturing Company ("Ohio–Sealy"), Sealy's majority stockholder. Sealy is one of the nation's leading manufacturers and distributors of bedding products, and is over 93% owned by Ohio–Sealy. The plaintiffs, who collectively own the remaining 6.1% of Sealy's stock, are its sole minority stockholders.[1] Under the terms of the proposed merger, Sealy is to be merged into Sealy Merging Corporation, a second-tier subsidiary of Ohio–Sealy,[2] and all shareholders other than Ohio–Sealy (*i.e.*, the plaintiffs) are to receive $178.46 cash—representing Sealy's book value as of December 31, 1986—for each share of their Sealy stock.

Upon filing this action, the plaintiffs sought a preliminary and permanent injunction against consummation of the merger. Expedited discovery was conducted during the week of February 15, 1987, and a hearing on the preliminary injunction motion was scheduled for February 23, 1987, one day before the stockholders' meeting at which the merger was to be approved.[3] In response, the defendants postponed the stockholders' meeting for the purpose of discussing settlement. Settlement was not achieved, and the plaintiffs

---

**1.** At the time that the merger was originally proposed, Ohio–Sealy owned approximately 82% of Sealy's stock, the plaintiffs owned approximately 6.1%, and Sealy Mattress Company of Michigan ("Michigan–Sealy") owned 11.95%. In April, 1987, two months after this action was filed, Michigan–Sealy's business and assets, including its stock interest in Sealy, were acquired by Ohio–Sealy.

**2.** Sealy Merging Corporation is a wholly-owned subsidiary of Ohio–Sealy which in turn is wholly-owned by Ohio Mattress Corporation ("Ohio Mattress").

**3.** Approval of the merger was a foregone conclusion. The Information Statement disclosed that Ohio–Sealy intended (and still intends) to vote its 93% stock interest in favor.

advised the defendants that they (the plaintiffs) intended to press their motion for a preliminary injunction. The defendants then announced that the merger would again be deferred, this time for the stated reason that Ohio Mattress intended to complete a public offering of its stock. They announced also that the stockholders' meeting would also be postponed until further notice.[4]

On February 27, 1987, the plaintiffs filed a motion for an allowance of attorneys' fees and expenses. The defendants opposed that motion on the grounds, *inter alia*, that no benefit had been achieved by the plaintiffs' efforts, because the merger had not been abandoned. The defendants also filed, and the parties subsequently briefed, a motion to dismiss the amended complaint.[5] On May 14, 1987, the day after this Court heard argument on the fee application motion, the defendants informed the plaintiffs and the Court that a stockholders meeting to approve the merger would be convened on July 21, 1987. The plaintiffs then renewed their motion for a preliminary injunction. Further expedited discovery and briefing followed, and oral argument on the preliminary injunction motion took place on July 7, 1987.

This is the decision of the Court on the plaintiffs' motion for a preliminary injunction.

## I. *The Facts*

To understand the issues presented, it is necessary to discuss the facts at somewhat greater than normal length. The material facts are essentially uncontested.

Sealy's principal business consists of manufacturing bedding products. Until recently, Sealy also derived revenues from a network of licensee organizations located in different states. The licensees manufactured and marketed bedding products under the Sealy tradename. With the excep-

tion of Ohio–Sealy, the Sealy licensees were also Sealy's stockholders. Until late 1986 when Ohio–Sealy acquired majority control of Sealy, the following entities owned Sealy stock in the following percentages:

| | |
|---|---|
| New York–Sealy | 18.66% |
| Kansas City–Sealy | 3.34% |
| Illinois–Sealy | 16.35% |
| Connecticut–Sealy | 14.96% |
| Maryland–Sealy | 8.51% |
| Memphis–Sealy | 15.59% |
| Virginia–Sealy | 2.83% |
| Michigan–Sealy | 11.95% |
| New Jersey–Sealy Group | 6.19% |
| Howard Haas [6] | 1.62% |
| | 100.00% |

For the previous 16 years, Ohio–Sealy had been involved in antitrust litigation against Sealy and certain of its licensees in the United States District Court located in Chicago, Illinois. Ohio–Sealy charged Sealy and the defendant licensees with having violated the federal antitrust laws in various respects. Michigan–Sealy, a licensee, was also a plaintiff in certain of those actions. On June 14, 1986, Ohio–Sealy obtained a verdict of $27 million against Sealy, plus a separate verdict of $50 million against Sealy and certain Sealy licensees that collectively owned about 58% of Sealy's stock.[7] Michigan–Sealy obtained a separate verdict of $45 million against Sealy alone. The antitrust defendants then filed post-trial motions attacking the antitrust judgments. In response, Ohio–Sealy and Michigan–Sealy pressed for an order requiring the licensee defendants to post appropriate security as a condition of their pursuing post-judgment relief.

Shortly after the June, 1986 verdicts, Ohio–Sealy filed new antitrust litigation against Sealy and the defendant licensees. That new litigation, combined with the $122 million of judgments, became material in-

---

4. In addition to Ohio–Sealy and its subsidiaries, the defendants include Sealy's directors, all of whom are employees of Ohio–Sealy or of Ohio Mattress.

5. The motion to dismiss has been denied in a separate Opinion being issued concurrently herewith.

6. All but Mr. Haas were licensees. Mr. Haas had for many years been Sealy's president and Chief Executive Officer.

7. *i.e.*, New York–Sealy, Minnesota–Sealy, Illinois–Sealy, Connecticut–Sealy and Maryland–Sealy.

ducements for the antitrust licensee defendants to sell their businesses (including their stock holdings in Sealy) to Ohio–Sealy. Accordingly, a series of negotiations between the licensees and Ohio–Sealy, followed by sales of the licensees' business to Ohio–Sealy, took place during the last quarter of 1986.

Specifically, during the fall of 1986, New York–Sealy negotiated a sale of its business (including New York–Sealy's 18% stock interest in Sealy) to Ohio–Sealy at a price representing book value. Thereafter in December, 1986, the remaining antitrust defendant licensees (Illinois–Sealy, Connecticut–Sealy, and Maryland–Sealy), plus Kansas City–Sealy, which was not a defendant, reached agreement with Ohio–Sealy to sell their businesses. The consideration was an overall, single lump sum for all of the businesses, which sum would be allocated among the sellers as they collectively agreed. Those acquisitions gave Ohio–Sealy an additional 43.16% of Sealy's outstanding stock which, when combined with previous stock purchases, made Ohio–Sealy the 77.41% owner of Sealy. Ohio–Sealy then purchased the Bluefields, Virginia–Sealy licensee, and later the stock of Howard Haas, Sealy's then-President. Those acquisitions brought Ohio–Sealy's stock ownership of Sealy up to approximately 82%.

All of the sales of the licensees' businesses to Ohio–Sealy took place against the backdrop of both the Damoclean $122 million antitrust judgments and the prospect of continued antitrust litigation. As stated, the Sealy stock owned by each of the acquired licensees was included among the assets sold to Ohio–Sealy. The price paid by Ohio–Sealy for the licensees' respective bedding businesses was, in each case, negotiated. However, in all cases Ohio–Sealy insisted upon allocating book value to the acquired licensee's Sealy stock. Several licensees testified that the Sealy stock, standing alone, was worth significantly more, but the licensees did not oppose allocating book value as the agreed price for their Sealy stock because the overall purchase price for the combined assets was acceptable to them. How that price was to be allocated among specific acquired assets was not important.

Because Ohio–Sealy would be taking control of Sealy, Ohio–Sealy's counsel requested the federal court in the antitrust litigation to defer ruling upon the antitrust defendants' post-trial motions challenging the antitrust judgments. That court did so defer. Ohio–Sealy's counsel also instructed Sealy's antitrust counsel to take no further action to challenge the verdicts. That directive was also carried out. As of this time no steps have been or are being taken to obtain post-judgment review of the antitrust verdicts.

In late November, 1986, Frederic F. Brace, Jr., Esquire, Ohio–Sealy's Chicago, Illinois antitrust counsel, recommended to his client that it assume control of Sealy shortly after the closing on the licensee acquisitions. Mr. Brace recommended that nondirector employees of Ohio–Sealy be elected as the majority of the members of Sealy's Board, because, in Brace's view, the Clayton Act arguably prohibited electing persons who were directors of Ohio–Sealy or Ohio Mattress.

On December 29, 1986, Ohio–Sealy assumed control of Sealy, and following Brace's advice, reconstituted Sealy's Board with its own appointees. That was accomplished by a written consent executed by defendant Thomas Smudz, acting on behalf of Ohio–Sealy in its capacity as Sealy's controlling stockholder, in which he and defendants Charles Kneeland and Gary Pleasant were named as Sealy's Board of Directors. All of Sealy's new Board members are employees of Ohio–Sealy or Ohio Mattress, Ohio–Sealy's parent. Each director reports either directly to Ernest Wuliger, Chairman of Ohio Mattress, or to a person who reports to Mr. Wuliger. Mr. Smudz has worked for Ohio Mattress for eight years, during the last five of which he has been Ohio Mattress' Vice President. Mr. Kneeland has worked for Ohio–Sealy for eighteen years and since April 1986 has been its President. Mr. Pleasant has been employed by Ohio–Sealy for the last two years and currently serves as its Vice President.

Shortly before the change of control, Ohio–Sealy and Ohio Mattress entered into a Memorandum of Understanding with Sealy. In the Memorandum, Ohio–Sealy represented that "any offer it will make to purchase the remaining outstanding shares of Sealy that it has not previously committed to purchase will be made for cash in an amount per share of no less than $178.46, which is the amount per share paid in connection with the transaction [defendant Ohio–Sealy's impending acquisitions of the Sealy licensees] based upon the existing capitalization of Sealy." Ohio–Sealy further represented that it intended "to fulfill its fiduciary duties in its dealings with and treatment of [the minority] stockholders...." Sealy's former directors testified that that Memorandum did not signify an understanding on their part that $178.46 per share was a fair price. They also testified that they did not know what a reasonable and fair price would be.

Apropos book value, it is important to note that during the six months intervening between the June, 1986 antitrust verdicts and Ohio–Sealy's December 29, 1986 assumption of control, several events occurred of which Ohio–Sealy and Mr. Smudz were or soon became aware. Those events indicated that Sealy's book value—the price allocated for the licensees' Sealy stock—was considerably less than Sealy's fair value. At $178.46 per share, Sealy's book value is approximately $58 million dollars ($178.46 x 325,703 shares = $58,000,000).

In July, 1986, Salomon Brothers performed a valuation of Sealy to assist the antitrust defendants in meeting security and bond requirements. Salomon valued Sealy at $140 to $160 million. In October, 1986, Morgan, Lewis, Githens & Ahn performed a study that also contained relevant valuation information. In November, 1986, Shearson Lehman Brothers made an offer to acquire Sealy for approximately $150 million. In response, Sealy's President Howard Haas and Messrs. Jay and Robert Pritzker made a competing offer to acquire all of the stock of Sealy for approximately $152.5 million. Those offers were not accepted, the licensee stockholders having decided instead to sell their businesses and Sealy stock to Ohio–Sealy.[8]

Lastly, Mr. Smudz, in his capacity as an Ohio–Sealy executive officer, had prepared valuations of Sealy and had sent them to Ohio–Sealy's investment banker. In a letter to Lazard, Freres & Co. dated December 2, 1986, Mr. Smudz expressed his belief that "the [Sealy] name alone (which he included among 'other intangibles—Sealy tradename, etc.' at a value of $102 million) ... might be worth $100–$300 million." That amount was in addition to the "net assets" figure of $54,187,000 at which Ohio–Sealy carried its investment in Sealy, Inc.

As a result of Ohio–Sealy's acquiring the licensees in late 1986, only two minority stockholders of Sealy remained—the plain-

**8.** Under the circumstances, the licensees had little practical choice. The Shearson and Pritzker proposals would have required that about 90% of the purchase price be placed into escrow for payment of the antitrust judgments and litigation expenses. Because of the pendency of those judgments, acceptance of the Shearson or Pritzker offers would leave the licensee-sellers in a position of uncertainty as to what amount of net proceeds that they would ultimately receive and when they would receive it. The liquidation of those judgments was largely in the control of Ohio–Sealy, subject only to post-verdict challenges and possible appellate review. There is evidence—not rebutted by the defendants—that those judgments were worth considerably less than their face amount. In a letter to Ohio Mattress' President, Mr. Brace opined that Michigan–Sealy's $45 million judgment was worth only $20 million. Moreover, the antitrust defendants' attorneys had taken the position

that Ohio-Sealy's judgment was vulnerable in several respects. No objective determination had been made of the worth of these judgments. As a $77 million judgment creditor of Sealy with the goal of obtaining control of Sealy for itself, Ohio–Sealy had no interest in resolving the issue of the validity and amount of the judgments before achieving its objective. Given Ohio–Sealy's significant leverage due to its judgment creditor status, the Sealy licensees apparently found it preferable to sell their business to Ohio–Sealy for an overall price that would be immediate and certain, rather than to accept an offer from Shearson or the Pritzkers that had built-in uncertainties and that would result in a delayed payment of most of the purchase price (in some unknowable amount) until an indefinite point in the future after what promised to be years of hard-fought litigation against Ohio-Sealy.

tiffs (the New Jersey–Sealy group) and Michigan–Sealy, which held a $45 million antitrust judgment against Sealy. Michigan–Sealy's status as a judgment creditor placed it in a position of conflict with, and of adversity to, its erstwhile ally, Ohio–Sealy, because Ohio–Sealy now owned 82% of the judgment debtor (Sealy). Because of its interest in eliminating Michigan–Sealy as a judgment creditor, Ohio–Sealy had a strong incentive to acquire Michigan–Sealy's assets, including its $45 million judgment. Accordingly, since at least November, 1986, Ohio–Sealy had been exploring ways in which it might acquire Michigan–Sealy and thereby eliminate it from the picture.

The merger became the defendants' chosen method of bringing Michigan–Sealy (and, it was hoped, New Jersey–Sealy) to terms. In a letter written by Mr. Brace to Ronald E. Trzcinski, President of Ohio Mattress, on January 6, 1987, Mr. Brace advised:

> I enclose a bare-bones communication reflecting what I think Sealy's new board should do fairly soon. Also, I think they should initiate a merger at the same time. That will put Michigan in the position of simultaneously evaluating its inconsistent positions as both a shareholder and judgment creditor of Sealy.

After summarizing his negotiation with Michigan–Sealy's representative over the issue of price, Mr. Brace concluded thusly:

> Whatever else we do, we should buy Michigan's $45 million judgment against Sealy, rather than have Sealy satisfy it for a lesser amount. That will increase our advantage vis a vis Paterson [New Jersey–Sealy].

It was in that adversarial posture that the stage was set for the proposed merger that is the focus of this litigation.

On January 21, 1987, Sealy's directors held a meeting by telephone to approve the merger. The meeting lasted between fifteen minutes and one-half hour. Sherry Treston, Esquire, an attorney with a Chicago firm that acts as corporate counsel to Ohio Mattress, also participated.

Before the meeting the directors had received nothing but a copy of the resolutions, which included the proposal for the merger that they later approved *verbatim.* During the meeting the directors had no materials available to them, including financial information, other than the proposed resolutions. The $178.46 per share merger price was presented to the directors by Ms. Treston as a *fait accompli,* with no explanation other than that book value was the number that Ohio–Sealy had used in all of its negotiations to acquire the licensees' Sealy stock. That price was accepted with no deliberation as to its basis or adequacy, and no other price was discussed. No determination was made that the $178.46 price was fair or what a fair price would be, no investment banker or other financial expert was hired or consulted for any purpose, and no consideration was given to appointing a special committee of disinterested persons to review independently the merger price or to represent the minority shareholders.

The Board neither had, nor did it request, any documentation to support the adequacy of the merger price. Nor was the Board made aware of the Salomon Brothers July, 1986 valuation of Sealy ($140–$160 million), the Shearson Lehman Brothers, Inc. offer for Sealy (approximately $150 million), the Haas/Pritzker offer in the fall of 1986 ($152.5 million), or the study by Morgan, Lewis, Githens & Ahn in October, 1986. Mr. Smudz did not share with his fellow directors his knowledge of that information or his opinion that the value of the Sealy name alone was possibly as high as $300 million.

A critical factor in any assessment of the fairness of the merger price was the value of the antitrust judgments. (*See* fn. 8, *supra*) That issue was never addressed. There is evidence that the value of the judgments was less than the $122 million gross amount of the verdicts. Mr. Brace had earlier opined to Mr. Trzcinski that Michigan–Sealy's $45 million judgment was probably worth only $20 million, a valuation later borne out by Ohio–Sealy's subsequent acquisition of Michigan–Sealy. Mr. Brace had also opined to his client that as a

result of Ohio–Sealy's acquisition of the licensees, "it could be argued that our [antitrust] judgments have been satisfied at least to the extent of $50 million and possibly to the extent of the full $77 million." The Board did not consult Sealy's (or Ohio–Sealy's) attorneys in the antitrust case to assess the risk that the antitrust judgments might be reversed or reduced, or otherwise to determine how those judgments might be objectively valued.

In sum, the Sealy Board, in approving the merger, acted solely as conduits to implement the will of their employers, Ohio–Sealy and Ohio Mattress. The 15 to 30 minute meeting had six important agenda items of which the merger was but one.[9] The agenda had been established by Ohio–Sealy's antitrust lawyer, Mr. Brace.

One week later, the defendants mailed an Information Statement to the plaintiffs and to Michigan–Sealy, announcing the proposed merger, and noticing a special stockholders meeting for February 24, 1987, to approve the merger. The Information Statement contained only skeletal information, *viz.*, a description of the terms of the merger, including the $178.46 per share price, and statutory appraisal rights. The only financial data supplied in the Information Statement consisted of one-half page chart showing Sealy's revenue, net income, and dividend-per-share information for 1984 and 1985 and for the nine months ended September 30, 1986. Other than that, the only value pertaining to Sealy that was described in the Information Statement was book value. The Information Statement promised that the 1986 financial statements would be furnished on February 20, 1987, four days before the meeting. It further disclosed that the approval of the merger was assured, since Ohio–Sealy intended to vote in favor of it.

After receiving the Information Statement, plaintiff Walter Hertz, on behalf of the other plaintiffs, retained counsel (Skadden, Arps, Slate, Meagher & Flom) in early February, 1987. Shortly thereafter, this action was filed derivatively on behalf of Sealy and individually on behalf of the minority stockholders other than Michigan–Sealy. In their complaint the plaintiffs alleged that the merger price was unfair, that material facts had been misrepresented in the Information Statement, and that the merger terms had not been adequately considered by Sealy's Board. As previously noted, the defendants responded by postponing the stockholders meeting. They then deferred the merger until further notice.

By way of hindsight, it is apparent that Ohio–Sealy's objective in postponing the merger was to enable it to complete its acquisition of Michigan–Sealy, with which it had been negotiating since the fall of 1986, and to wage its dispute with plaintiffs in a forum of its own choosing. On February 19, 1987, Ohio–Sealy and Michigan–Sealy reached an agreement in principle for Michigan–Sealy to sell its ($45 million) judgment, its business, and its Sealy stock[10] to Ohio–Sealy for a total price of $45 million. That agreement was reduced to a written contract dated March 26, 1987. As part of the acquisition, Ohio–Sealy originally offered, and Michigan–Sealy agreed, to have Sealy pay $25 million for the antitrust judgment. Ohio–Sealy then changed its mind and advised A. Bart Lewis, Michigan–Sealy's former president, that it had decided to allocate $35 million to the judgment in order to achieve tax benefits for itself. Thus, the portion of the total purchase price that was allocated (and that was to be paid by Sealy) for Michigan–Sealy's judgment was increased by almost $10 million dollars, and the amount allocated to Michigan–Sealy's business was correspond-

9. The other agenda items were: increasing Sealy's royalties to the maximum level, eliminating exclusive manufacturing territories provided in the Sealy License Agreement, authorizing discussions concerning the sale of the Des Moines plant, authorizing negotiations to end certain antitrust litigation in Canada, and making Canada available for competition by all Sealy licensees.

10. The price for the Sealy stock owned by Michigan–Sealy was to be determined by an appraiser agreed to by the parties or by an appraisal pursuant to 8 *Del.C.* § 262.

ingly reduced.[11] The effect of the unilaterally increased allocation (consistent with Mr. Brace's earlier advice to "buy Michigan's $45 million judgment against Sealy rather than have Sealy satisfy it for a lesser amount" in order to "increase our advantage vis a vis [New Jersey–Sealy]") was to increase Sealy's liability to Ohio–Sealy—and thereby to decrease Sealy's asset value—by $10 million dollars.[12]

The Michigan–Sealy purchase was consummated in early April, 1987. Having thus eliminated Michigan–Sealy from the scene, Ohio Mattress was then able to concentrate its fire upon New Jersey–Sealy, the corporation's only remaining minority stockholder. On April 10, 1987, Ohio Sealy and Sealy filed two lawsuits against New Jersey–Sealy in the United States District Court in Chicago, Illinois. In one of those actions (*Sealy, Incorporated, et al. v. Sealy Mattress Company of New Jersey*, No. 87–C–1477),[13] Ohio–Sealy alleged that New Jersey–Sealy's filing of this Chancery action constituted a violation of the federal antitrust laws, an abuse of process, and malicious prosecution, for which Ohio–Sealy claimed $2 million in compensatory damages, plus punitive damages.[14] Ohio–Sealy also initiated intensive discovery, noticing and taking eleven *seriatim* sets of depositions in this and the Chicago federal action.

Plaintiffs claim that these tactics, among others, were part of Ohio–Sealy's broader strategy to use litigation as a weapon to beat them into submission and to force them to sell their business and Sealy stock on unfavorable terms.

If that was Ohio–Sealy's objective, it did not succeed. Plaintiffs vigorously defended the Chicago actions and pressed their motion in this Court for attorneys' fees. In response, the defendants announced that they would revive the proposed merger that had been shelved since March, 1987, and for that purpose the defendants later noticed a special stockholders' meeting for July 21, 1987.

The defendants also issued a Supplemental Information Statement, which consisted largely of (i) *verbatim* quotations from the "disclosure" allegations of the plaintiffs' own complaint, (ii) argumentative assertions that the Salomon Brothers valuation "did not assess any value to ongoing or pending litigation" and that the Haas/Pritzker offer required that $135 million of the offering price be escrowed for payment of the judgment and expenses, (iii) selective information about the terms of the Michigan–Sealy acquisition, and (iv) certain other matters.[15]

---

**11.** The amount allocated to Michigan–Sealy's business was reduced by $5.5 million, not by the full $10 million that had been shifted from the business to the judgment, because Ohio–Sealy added nearly $4 million to the total package to offset adverse tax consequences to Mr. Lewis that would have resulted from the inflated price paid for the judgment.

**12.** These facts were not disclosed in the Information Statements and were not uncovered until plaintiffs took Mr. Lewis' deposition during discovery.

**13.** The second federal action was dismissed in June, 1987 on the motion of New Jersey–Sealy.

**14.** In their federal complaint, Sealy and Ohio–Sealy made allegations in which they admitted that the book value of Sealy stock was less than its going concern value. Paragraph 29 of the Ohio–Sealy's federal complaint alleges:

29. At no relevant time was it defendant's [New Jersey–Sealy] primary purpose or motive to obtain an adjudication from the Delaware Court on their request for a permanent injunction against Sealy, Inc.'s proposed cash-

out merger. On the contrary, defendant does not want to retain *its Sealy, Inc., stock,* which pays no dividends and *can only be sold for book value, which is less than its actual going-concern value.* Defendant concedes that the Delaware Chancery Court cannot grant relief with respect to the other matters complained of in its Delaware suit, such as raising royalties, trying to end the Chicago antitrust litigation, and eliminating the exclusive manufacturing territories. (Emphasis added).

**15.** Those other matters included the following disclosure:

"In connection with appraisals performed after the acquisitions by Ohio–Sealy Mattress Manufacturing Co. of the seven Sealy licensees, an appraisal performed by Marshall and Stevens Incorporated valued the Corporation at $117.5 million, plus or minus 20%, without assessing any value to on-going or pending litigation."

A copy of the Marshall, and Stevens report, the existence of which had never been disclosed, was made available to plaintiffs' counsel, only a few days before the oral argument on the injunction motion.

However, the Supplemental Statement, like its predecessor, disclosed no information as to the process by which the book value merger price was arrived at, the directors' assessment of the value of the antitrust judgments (including the fact that $35 million had been allocated to the Michigan–Sealy judgment), or other pertinent financial information that would enable plaintiffs to assess the fairness of the merger price.

This renewed motion for a preliminary injunction followed.

## II. *The Law*

The standards governing a motion for preliminary injunctive relief are well established. The plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer imminent irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if relief is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del. Supr., 506 A.2d 173, 179 (1986); *Gimbel v. Signal Companies*, Del.Ch., 316 A.2d 599, 602–03, *aff'd*, Del.Supr., 316 A.2d 619 (1974); *Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985).

█ It is undisputed that Sealy's parent corporation, and its directors who are employees of and are controlled by Sealy's majority stockholder, stood on both sides of the proposed merger and fixed its terms. Under those circumstances the defendants have the burden of establishing the entire fairness of the merger, *i.e.*, the "most scrupulous inherent fairness of the bargain," sufficient to pass the test of careful scrutiny by the courts. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983); *Gottlieb v. Heyden Chemical Corp.*, Del. Supr., 91 A.2d 57, 58 (1952); *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952).

█ The concept of entire fairness is not restricted to matters of valuation alone. Fairness embraces "fair dealing" as well as "fair price." *Weinberger*, 457 A.2d at 711. Fair dealing includes fairness as to "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Thus, a determination of whether the plaintiffs have shown a likelihood of success on the merits necessarily involves an assessment, based upon the present record, of whether the defendants will be able to carry their ultimate burden of persuading the Court that the transaction is entirely fair in the dual sense of fair dealing and fair price. *Cf. David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427, 431 (1968). It is from that standpoint that the plaintiffs' motion is evaluated.

The plaintiffs' probability of success on the merits is treated in Part III, *infra*, of this Opinion. The issue of irreparable harm is addressed in Part IV, *infra*.[16]

## III. *Probability of Success*

### A. *Fair Price*

Although the plaintiffs focus primarily upon the element of fair dealing, fairness

---

**16.** The third factor, the "balance of hardships," requires no extended discussion, because the defendants' "balance of hardships" argument—that no injunctive relief is available to plaintiffs as a matter of law because of the availability of a damages or appraisal remedy—goes to the issue of irreparable harm and is thus more appropriately addressed in that portion of the Opinion. Moreover, it is clear from the record that any harm that the defendants might suffer from a preliminary injunction would be *de minimis*. The defendants have not shown, nor do they claim, any reason why the effectuation of the merger should be viewed as a matter of particular urgency. When confronted with plaintiffs' injunction motion, the defendants postponed the merger indefinitely, electing instead to do battle with the plaintiffs in their newly-filed federal court litigation in Chicago. Only after plaintiffs insisted upon pressing their motion for attorneys' fees (predicated upon the argument that the plaintiffs' litigative efforts caused the defendants to abandon the merger, thereby creating a compensable corporate benefit) did the defendants elect to revive their merger proposal. The inescapable inference from the record is that if the plaintiffs had not pressed their attorneys' fee motion, the merger would have continued in its state of dormancy while the defendants responded to plaintiffs' charges against them—not as defendants in this lawsuit but as plaintiffs in their chosen Chicago forum.

of price is an element of their case as well. Moreover, price considerations form much of the essential background for the analysis of the fair dealing issues. Accordingly, the matter of fair price is first addressed. Under that heading the question becomes whether, based on the present record, the defendants will probably succeed in carrying their burden of proving that the book value merger price of $178.46 per share is entirely fair. The answer, in my opinion, is clearly no.

■ The critical fact relating to fair price is that the present record does not disclose what Sealy's present fair value or price might be. No one, including Sealy's directors, has attempted to make that determination. What the record does show is substantial (and disturbing) evidence that Sealy's fair value is significantly higher than the $58 million dollar book value price being offered in the merger.

The defendants seek to justify the book value figure on the basis of the December, 1986 Memorandum of Understanding, in which Ohio–Sealy and Sealy's former directors agreed that any offer by Ohio–Sealy to acquire Sealy would be for not less than $178.46 per share. Defendants claim that the Memorandum represents a good faith business judgment by Sealy's prior independent directors that book value is a fair price for Sealy. For that purpose the defendants also rely upon the fact that in the various licensee acquisitions which occurred in late 1986 (transactions which, the defendants assert, were the subject of hard arm's length bargaining), the licensees were willing to accept book value as the price for their Sealy stock.

The record fails to support either contention. As previously indicated, Sealy's former directors never determined that $178.46 per share was a fair price. One former director testified that the former board "had no idea what a reasonable and fair price would be, because this price ... was not ... arrived at with arm's length

bargaining...." And while the licensee acquisitions might have involved arm's length bargaining, the bargaining focused upon the *overall* price for the licensees' businesses, not upon the Sealy stock that was but one of a multitude of assets being acquired. At Ohio–Sealy's insistence the parties agreed that book value would be the price allocated to the Sealy stock component. The testimony of the licensees (including Michigan–Sealy) fairly indicates that they believed that Sealy's stock, standing alone, was worth substantially more than book value, but were willing to accept book value because the overall purchase price was acceptable. One licensee testified that the Sealy stock was "worth a hell of a lot more than $58 million" but that the licensees were persuaded to accept book value because they would receive "inflated" prices for their bedding businesses and an enhanced price above book value for the Sealy stock if the closing on the stock purchase took place during 1987.[17]

That latter point warrants elaboration. During discovery the plaintiffs learned that the book value price that was to be paid to the licensees for their Sealy stock—the price which the defendants now assert as justification for the merger price—was higher than what the defendants now propose to pay in the merger. The consideration the licensees were to receive for their Sealy stock was based on a book value of $65 million—$7 million more than the $58 million book value being used as the basis for the merger price. That higher amount was offered to any licensees whose Sealy stock was acquired in 1987. In this merger the plaintiffs are being forced to surrender their stock in 1987. Yet the merger consideration is based on a price $7 million lower than what the defendants were willing to pay to those licensees. That price differential, if offered to the plaintiffs, would represent an additional $427,000 for plaintiffs' 6.1% stock interest.

The defendants' own internal documents and in-court representations are further ev-

---

17. Mr. Haas' sale of his Sealy stock at book value is similarly unreliable as evidence of the fair value of his Sealy stock. Haas feared that if he objected to Ohio–Sealy's proposal to pay him

book value for his Sealy stock, Ohio–Sealy would terminate his more valuable severance agreement. Accordingly, Mr. Haas decided "to get out and take the money and run."

idence that book value does not represent a fair price for the Sealy stock. The minutes of Ohio Mattress' January 10, 1987 board meeting reflect Mr. Wuliger's statement that:

"... in his view, the recent $77 million judgment by the Company [Ohio–Sealy] made possible both the significantly favorable price paid for the [licensees'] Sealy, Incorporated stock...."

And in their federal complaint filed in Chicago in April of this year, Ohio–Sealy and Sealy judicially admitted that Sealy's book value is "less than its actual going concern value."

Finally, there are the valuations of Sealy by Salomon Brothers at $140–$160 million, the Shearson offer to acquire Sealy for approximately $150 million, the Haas/Pritzker offer to acquire Sealy for $152.5 million, and Mr. Smudz' opinion that the Sealy name alone might be worth as much as $300 million. These offers and valuations were for prices averaging two and one half times Sealy's book value. To arrive at a fair value, an appropriate adjustment would have to be made for the value of the Michigan–Sealy and Ohio–Sealy judgments, as determined in some objective manner. However, defendants have made no effort to adduce evidence of what those judgments are objectively worth. Of the $122 million face amount of the judgments, $45 million consisted of the Michigan–Sealy judgment which both Ohio and Michigan–Sealy agreed was worth $25 million.[18] And defendants have not shown that the Ohio–Sealy judgment is objectively worth its $77 million face amount. On the contrary, there is evidence that Ohio–Sealy's judgment, objectively valued, may be worth considerably less, and the defendants have adduced no evidence that shows otherwise. Moreover, by their actions defendants have made highly difficult any objective evaluation of Ohio–Sealy's antitrust judgment, because they have not permitted Sealy to pursue post-trial review of those judgments and have allowed both judgments to remain unsatisfied in their full amount.

Accordingly, I find that the plaintiffs will probably succeed in establishing at a final hearing that $178.46 per share is not a fair price for their Sealy shares.

### B. *Fair Dealing*

 Under this heading the second question becomes whether, based upon the present record, the defendants will probably succeed in carrying their burden of proving that they, in their capacity as fiduciaries, dealt fairly with the plaintiffs in seeking to accomplish this particular merger. Again this answer must clearly be no.

 As fiduciaries seeking to "cash out" the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects. *Weinberger v. UOP, Inc.*, 457 A.2d at 710. The majority stockholder was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price. The corporation's directors were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, were fair and that the merger would not become a vehicle for economic oppression. And finally, the directors (and the majority stockholder, to the extent that it involved itself in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post-merger damage action.

None of these fiduciary obligations were satisfied in this instance. Indeed, if one were setting out to write a textbook study on how one might violate as many fiduciary precepts as possible in the course of a single merger transaction, this case would be a good model.

---

**18.** The unilateral allocation by Ohio–Sealy of the additional $10 million to that judgment will

be disregarded for present valuation purposes.

### 1. *Timing and Structure*

The concept of fair dealing, as defined in *Weinberger v. UOP, Inc.*, 457 A.2d at 711, embraces the notion of fairness as to the timing and structure of the challenged transaction. Here the merger was timed and structured in a way that had the foreseeable effect, if not the intent, of producing an unfair result.

■ First, the corporate defendants timed the merger to occur at a time when valuation of Sealy was difficult, if not impossible, because of defendants' refusal to permit post-trial review of the antitrust judgments. Moreover, the corporate defendants used those judgments, and took other steps as well, to manipulate Sealy's values for their benefit and to the plaintiffs' detriment. Rather than satisfy the Michigan–Sealy judgment at its fairly-determined value, Ohio–Sealy purchased that judgment and caused Sealy to overpay for it by $10 million dollars. The record evidence indicates that that was done deliberately.[19]

There is other evidence that values were manipulated to the minority's detriment. Defendants' corporate counsel wrote on his copy of Mr. Brace's January 6, 1987 letter the following comment: "to the extent these actions increase the value of Sealy, they should be deferred." The "actions" being referred to included the acquisition of Michigan–Sealy's antitrust judgment and business. Mr. Brace's letter, upon which the foregoing advice was noted, was written only two weeks before the directors meeting at which the merger was approved.

All of the foregoing evidence, not rebutted by defendants, suggests a calculated effort to depress the price of Sealy until the minority stockholders were eliminated by merger or some other form of acquisition. Such behavior by a majority stockholder constitutes unfair dealing. *See Roizen v. Multivest, Inc.*, Del.Ch., C.A. No. 6535, Brown, V.C. (September 25, 1981); *Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d 584, 599 (1986) ("prototype instance" of majority stockholders breach of duty involves timing of merger with resulting financial injury to minority and with commensurate gain to controlling stockholder); *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1107 (1985) (claim that merger timed so as to avoid contractual duty held to state a claim of breach of duty of fair dealing).

■ A second indicium of fair dealing, or its absence, is whether the process by which the merger terms were arrived at involved procedural protections that would have tended to assure a fair result. For example, in *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985) the Supreme Court held that the majority stockholder had dealt fairly with the minority in proposing a cash-out merger, where the transaction had been negotiated by an independent committee representing the minority, an investment banking firm had been retained to advise the committee, and the merger required approval by a majority of the minority stockholders. By the same token, in *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d at 599, this Court observed that the absence of a minority stockholder "veto" and of an independent board committee to negotiate on behalf of the minority, are "pertinent factors" in assessing whether fairness was accorded to the minority.

Here the majority stockholder, Ohio–Sealy, unilaterally determined the merger price without putting into place any of the procedural protections, such as those described above, that would have tended to assure a

---

**19.** The defendants contend that their decision not to permit review of the antitrust judgments, if found to constitute unfair dealing, would be tantamount to a ruling that a merger can never occur while material litigation remains unresolved. That contention misses the point. The relevant principle is that the defendants, as fiduciaries, cannot cause the litigation to remain unresolved and then take advantage of that non-resolution for their own benefit and to the mi-

nority stockholders' detriment. The defendants had a duty to determine objectively the value of the antitrust judgments. That might be done in many ways, including (i) having the litigation resolved judicially by post-judgment review, (ii) appointing an independent committee to negotiate a settlement, or (iii) retaining independent financial and legal advice to assist the directors in a good faith determination of the value of the judgment. None of those steps was taken.

fair substantive result. No independent directors were put on the Sealy board, no steps were taken to appoint independent representatives to negotiate on behalf of the minority, and no independent investment banker or other financial expert or legal counsel was retained to represent the minority interests. In short, the minority stockholders were were left exposed to the discretion of a majority stockholder whose interests were in direct conflict with theirs and whose approach to these matters was, and has continued to be, unremittingly hostile. The absence of these procedural safeguards, while not actionable of themselves, is highly persuasive evidence that the merger terms were the product of unfair dealing.

## 2. *Uninformed Board Approval of the Merger*

Before making a business decision, the directors of a corporation, in discharging their duty of care, must inform themselves of all available material information. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872–873 (1985). In the case of a merger under 8 *Del.C.* § 251(b), that duty is a statutory as well as a common law obligation. Indeed, the Supreme Court has indicated that a merger that has not been the subject of a properly informed director judgment may not be submitted to shareholders. That Court said in *Smith v. Van Gorkom,* 488 A.2d at 873:

> In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del.C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of 8 *Del.C.* § 251(b) may be submitted to the shareholders under § 251(c). (Citations omitted).

■ In this case it is undisputed that Sealy's directors, in approving the merger, were completely uninformed and made no effort to inform themselves of the material facts. Indeed, the defendants concede in their brief that the directors were not independent and that they "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding...." Ohio–Sealy's attorney told the Sealy directors that the $178.46 book value price was what Ohio–Sealy intended to pay. Sealy's directors, all of whom were employees of, and beholden to, Ohio–Sealy or Ohio Mattress, uncritically accepted that price. They did so (to reiterate) without making any effort to determine whether the price was fair, without considering facts that would bear materially on that issue (including the Shearson and Pritzker offers, the Salomon evaluation, Mr. Smudz's opinion as to the value of the Sealy name, or the value of the antitrust judgments), and without independent expert financial or legal advice.

Given these circumstances, one might debate the legal characterization that most appropriately describes the conduct of the Sealy directors and of the majority stockholder to whom those directors apparently felt they owed their exclusive loyalty. For this purpose it is enough to say that the manner in which this merger was considered and blessed amounted to a fundamental breach of the directors' duty of care and violated 8 *Del.C.* § 251(b) as that statute has been interpreted in *Smith v. Van Gorkom.*

The defendants argue that even though the Sealy directors were not personally informed of the facts, they did not have to be, because they were entitled to rely upon the judgment of Ohio–Sealy, whose directors were properly informed. That position is incorrect as a matter of law and fact, and runs counter to fundamental principles of law applicable to fiduciaries of Delaware corporations.

As key employees of Ohio–Sealy and Ohio Mattress, the individual defendants were entitled, indeed obliged, to demonstrate their loyalty to their employer whose directions they were bound to follow. But

once having assumed the position of directors of Sealy, Inc., a corporation that had stockholders other than Ohio–Sealy, those defendants became fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders. The fiduciary obligation they assumed was not unlike that of persons holding dual directorships in both a parent and subsidiary corporation. As to such persons, the Supreme Court admonished in *Weinberger v. UOP, Inc.*, 457 A.2d at 710–711:

> There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. *Levien v. Sinclair Oil Corp.*, Del.Ch. 261 A.2d 911, 915 (1969). Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and in the absence of an independent negotiating structure ... or the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies. *Warshaw v. Calhoun*, Del.Supr., 221 A.2d 487, 492 (1966).

And again in *Smith v. Van Gorkom*, 488 A.2d at 872, the Supreme Court said:

> But fulfillment of the fiduciary function requires more than the mere absence of bad faith or fraud. Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information of the type and under the circumstances present here.

*See also Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 364 (D.Del.1975).

■ Thus, the Sealy board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority. Just as there is no "safe harbor" for directors with divided loyalties, *Weinberger v. UOP, Inc.*, 457 A.2d at 710, Sealy's directors cannot erect those divided loyalties as a defense so as to excuse abdicating their fiduciary responsibility to the minority stockholders.[20]

### 3. *Disclosure of Material Facts Pertaining to the Merger*

■ A third factor evidencing the presence or absence of fair dealing is whether the defendant fiduciaries disclosed to the minority stockholders all material facts pertaining to the merger. That the defendants had a fiduciary obligation to disclose all material facts in an atmosphere of complete candor is unquestioned. *Rosenblatt v. Getty Oil Co.*, supra, 493 A.2d at 944; *Smith v. Van Gorkom*, supra, 488 A.2d at 890; *Weinberger v. Rio Grande Industries, Inc.*, Del.Ch., 519 A.2d 116, 121 (1986). The fact that the defendants control the outcome of the vote on the merger and seek to force an involuntary acceptance of the merger, "makes this a more compelling case for the application of the recognized disclosure standards." *Wacht v. Continental Hosts, Ltd.*, Del.Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986), at 7 [Available on WESTLAW DE–CS database].

---

**20.** Even if the Sealy directors were entitled to rely upon the judgment of Ohio–Sealy as to the fairness of the merger terms (which they were not), such reliance would be of no help to them, because Ohio–Sealy's Board of Directors did not, insofar as the record discloses, purport to consider the fairness of the merger from the point of view of the minority. The Board considered the merger price only from its self-interested perspective, which was directly adverse to the minority's interests. The record is less than clear as to what materials the Ohio–Sealy Board actually did consider, but the Board did not attempt to obtain an objective valuation of Sealy's going concern value, taking into account the antitrust judgments as fairly valued. It appears that the materials concerning Sealy's value that the Ohio–Sealy Board did review were related to their decision to approve the acquisition of four licensees (and their Sealy stock) as a package for $161 million dollars.

In this case few, if any, of the facts material to an informed investment decision were disclosed, and the facts that were disclosed were, in the main, highly misleading.

The only value discussed in the Information Statement was book value, and the disclosures pertinent to book value were presented in a manner calculated to justify that figure. Those disclosures consisted of the following single paragraph:

> In reaching the above conclusion, the Board of Directors took into consideration that the $178.46 to be paid in the merger is the same price paid after vigorous arm's length negotiations in respect to (i) stock of the Corporation held by licensees of the Corporation acquired by Ohio–Sealy in December 1986 and (ii) stock of the Corporation formerly held by Howard G. Haas and acquired by Ohio–Sealy in December 1986. In addition, the Board of Directors took into consideration the fact that the independent directors of the Corporation, prior to their resignation, entered into a Memorandum of Understanding with Ohio–Sealy to effectuate the smooth transition of ownership in a manner designed by provide for, among other things, continuity in the operation of the business and to protect the minority stockholders of the Corporation and pursuant to which Ohio–Sealy represented that any offer it would make to purchase the remaining outstanding shares of the Corporation that it had not previously committed to purchase would be made for cash in an amount per share of not less than $178.46.

That disclosure was materially false and misleading in several respects. First, it implied that the Board had made an independent, informed judgment that book value was a fair price, whereas in truth the Board's decision was neither independent nor informed. In this context the quality of the Board's decision making process was material, since in a non-arm's length trans-

action, minority shareholders would normally be entitled (absent any disclosure to the contrary) to assume that the Board was acting to protect their interests. *See Wacht v. Continental Hosts, Ltd., supra,* at 8; *Kahn v. United States Sugar Corp.,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) [Available on WESTLAW, DE–CS database].

Second, the particular disclosures relating to book value were misleading. The Information Statement suggested that book value was a price that had been agreed to in prior "vigorous" arm's length negotiations. In fact, these negotiations were for the purchase of the licensees' entire businesses, including the Sealy stock. As previously indicated, the licensees acceded to book value as the allocated value of their Sealy shares, but did so for reasons totally unrelated to the value of that stock. Mr. Haas agreed to accept book value for his stock only because he did not want to risk Ohio–Sealy terminating his more valuable severance agreement. The description of the Memorandum of Understanding, with its suggestion that Sealy's prior board had determined $178.46 to be a fair price, which also was materially misleading. And entirely omitted from the Information Statement was the fact that the book value amount payable to licensees who sold their Sealy stock in 1987, was higher than the book value amount that was being offered to the minority stockholders who were to be merged out during the same year.[21]

Third, the Information Statement and the Supplement contained virtually no information material to any informed judgment on value. Nowhere disclosed were the prior offers or valuations, or the studies of Sealy that occurred during the latter part of 1986, involving values ranging from $140 to $160 million dollars. Nowhere is there any reference to or analysis of the value or effect of the antitrust judgments. And nowhere discussed are the corporation's future prospects, its business plans or

---

**21.** None of these disclosure violations were cured in the Supplemental Information Statement.

projected revenues or income. Moreover, the antitrust judgments were allowed to remain outstanding, even though Michigan–Sealy's $45 million judgment had been satisfied by Sealy's payment of $35 million —$10 million more than the judgment creditor and debtor had agreed it was worth. A false impression was thereby created that the judgments against Sealy remained an outstanding valid liability in the amount of $122 million.

These misdisclosures and nondisclosures were, in these circumstances, highly material and constituted violations of the defendants' duty of candor. *Weinberger v. UOP, Inc., supra,* 457 A.2d at 709; *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984); *Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278 (1977). So pervasive and so fundamental were those violations that it is difficult to conclude that they were unintentional. The defendants' duty of candor required them to provide the minority stockholders with sufficient information to enable them to make an informed, reasoned investment decision. *Wacht, supra,* at 7; *Weingarden & Stark v. Meehan Oil Co.,* Del.Ch., C.A. Nos. 7291 and 7310, Berger, V.C. (January 2, 1985). Clearly that was not done here.

Much of the foregoing the defendants do not seriously dispute. Their position is that the disclosures in the Information Statements do not constitute a fiduciary violation, because (i) most of the omitted facts were known to the plaintiffs, particularly Walter Hertz, at the time this lawsuit was filed, and (ii) if the plaintiffs did not know the material facts at that time, they know them now as the result of discovery. The first argument is incorrect as a matter of fact; the second is incorrect as a matter of law.

■ The defendants argue that plaintiff Hertz is knowledgeable of the facts because of his intimate acquaintance with Sealy (he had been a member of the Sealy Board), and because he had extensive contact with the other shareholders. But the record shows that except for Mr. Hertz, the other plaintiffs knew virtually nothing about Sealy's affairs. The record also shows that Mr. Hertz has not been a Sealy director since 1978, and had very limited knowledge of the material facts relating to Sealy's value, particularly the value of the antitrust judgments and Sealy's future business plans, projected earnings, and prospects.

■ The defendants further argue that the discovery in this case has cured any disclosure deficiencies. If that were the law no disclosure claim would ever succeed, because discovery of the proof of the merit of a disclosure claim would destroy its validity. Moreover, the disclosure burden owed by the fiduciary would be thrust upon the beneficiary to whom the duty is owed. The duty of candor must be discharged by the fiduciary directly to the beneficiary stockholder in the transaction itself, and not by the fiduciary's lawyer to the beneficiary's lawyer in the context of litigation.

For the above reasons, I find that the plaintiffs will probably succeed in establishing at final hearing that the defendants did not deal fairly with the minority stockholders in promulgating the challenged merger.

### IV. *Irreparable Harm*

■ The third and final question is whether if the merger is not preliminary enjoined, the plaintiffs will likely suffer irreparable harm. For the reasons now discussed, I find that they will.

To begin with, the plaintiffs have not received sufficient information to make an informed decision among the available alternatives, *i.e.,* whether to accept the merger price or to elect an appraisal or other judicial remedy. In this case the inability to make that choice constitutes irreparable harm, because once having foregone one remedy, the plaintiffs may be unable to obtain the economic equivalent of the others. In this case, for example, if the plaintiffs seek appraisal and it is later found that the antitrust judgments (objectively valued) reduce Sealy's fair value to less than $178.46 per share, plaintiffs would have lost their right to accept the higher merger price. *See* 8 *Del.C.* § 262(e). If plaintiffs were to accept the merger price and the values were later shown to be

higher than the merger price, then the plaintiffs would have lost their right to a fair price through appraisal. The plaintiffs should not be required to make these choices in the informational vacuum into which the defendants have thrust them. *See, e.g., In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 669, 679 (1986); *Trans World Airlines, Inc. v. Icahn,* 609 F.Supp. 825, 830 (S.D.N.Y.1985). An injunction is the remedy most likely to achieve disclosure of the information necessary to an informed decision.[22]

Second, the Board has approved a merger that has preliminarily been found to be in violation 8 *Del.C.* § 251(b) and which, as the Supreme Court indicated in *Smith v. Van Gorkom,* may not be submitted to the shareholders under § 251(c). While situations might arise where violations of this character would arguably not warrant an injunctive remedy, in this extreme set of circumstances where (i) the Board has made no informed decision, (ii) the Board is uniquely situated to make determinations concerning Sealy's value, and (iii) the Board has not disclosed material facts to the minority stockholders, an injunction is clearly the most appropriate remedy to vindicate the statutory mandate of § 251(b) and the policies underlying the fiduciary obligation of full disclosure.

Third, irreparable harm warranting injunctive relief is appropriate in cases where damages would be difficult to assess. *See In re Anderson, Clayton Shareholders' Litigation, supra,* 519 A.2d at 676. *Weinberger v. UOP, Inc.,* Del.Ch. C.A. No. 5642, Brown, (January 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) is an example of the difficulty of assessing damages in a parent-subsidiary merger in a trial occurring long after the event. In this case that difficulty is particularly significant, because due to the status of the antitrust judgments, damages may be highly difficult to calculate.

Those difficulties are avoided by a grant of preliminary injunctive relief.

I need not decide whether any of these factors, standing alone, would constitute irreparable harm warranting injunctive relief. In this case, the presence of all three factors in combination is clearly sufficient to establish irreparable injury.

■ The defendants' response is that no matter how egregious their conduct may be, as a matter of law the plaintiffs are not entitled to an injunction. Defendants argue that under *Weinberger v. UOP, Inc.,* which signaled a return to the "well established principles" of *Stauffer v. Standard Brands, Inc.,* Del.Supr. 187 A.2d 78 (1962), the exclusive remedy available in a parent-subsidiary merger, particularly where (as here) the parent owns over 90% of the subsidiary's stock, is an appraisal or, alternatively, a damage action. In short, defendants appear to be arguing that as a result of *Weinberger* and its progeny, injunctive relief has been judicially eliminated as a remedy in all but the most "extremely unusual" parent-subsidiary merger cases.

To that argument I would respond as follows: To say that this Court has the power to condemn the egregious conduct involved here (as it preliminarily has done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of that conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State. Given the nature of the conduct involved in this case and the harm that will likely result from it, only a clear, positive declaration by the Delaware Supreme Court proscribing injunctive relief would cause this Court to stay its hand. The defendants have cited no case which man-

---

22. Defendants argue that there is an air of unreality to this contention, since it is obvious that the plaintiffs have no intention of accepting the merger price. Plaintiffs point out, however, that appraisal and fraud suits are expensive to prosecute, that plaintiffs have no appetite for the expense and procedural delays of such litigation, and that if after the defendants, in com-

pliance with the law, independently value Sealy and it becomes apparent that the merger price is a fair one, plaintiffs may accept the merger price. But, plaintiffs say, the duty of valuation must be performed by Sealy, and cannot be thrust upon the minority stockholders as the defendants have sought to do here.

dates that result. Indeed, in *Rabkin v. Philip A. Hunt Chemical Corp.*, the Supreme Court held that an appraisal is not an exclusive remedy in cases involving a breach of the duty of fair dealing, of which this case is one. It may be arguable that as a result of *Weinberger* and *Rabkin*, injunctive relief may be less appropriate in certain parent-subsidiary merger cases. But neither decision proscribes the injunctive remedy altogether. On the contrary, the Supreme Court noted in *Weinberger*, 457 A.2d at 714, and has repeated in *Rabkin*, 498 A.2d at 1104, that:

> [W]hile a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable over-

reaching are involved. *Cole v. National Cash Credit Association*, Del.Ch., 156 A. 183, 187 (1931).

In this case misrepresentation, self-dealing, and gross and palpable overreaching have been alleged and preliminarily established. Damages, in these circumstances, would not be an adequate remedy. Therefore, I find that injunctive relief is the appropriate remedy and that the plaintiffs are preliminarily entitled to it.

\*　　\*　　\*

For the foregoing reasons the plaintiffs motion for a preliminary injunction is granted. An appropriate form of order will be submitted in conformity with this Opinion.